**NATIONAL INDEPENDENT COAL OPERATORS ASSOCIATION, INC., Clint Eagle Mining Company, Inc., Pigeon Branch Coal Co., Inc., Broyles and Dotson Coal Co., AKP Coal Company, Asher Coal Corporation, Everidge and Nease Coal Co., Inc., Pine Coal Corporation, and Clarence Maggard Coal Company, Incorporated, Plaintiffs,**

v.

**OLD REPUBLIC INSURANCE COMPANY and Bituminous Casualty Corporation, Defendants.**

Civ. A. No. 81–0094–A.

United States District Court,
W. D. Virginia,
Abingdon Division.

July 27, 1982.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiffs bring this action for a Declaratory Judgment pursuant to 28 U.S.C. § 2201. The plaintiff, National Independent Coal Operators Association, Inc., is a non-stock, non-profit corporation organized and existing under the laws of the Commonwealth of Kentucky and authorized to conduct its business in the Commonwealth of Virginia, having as its members numerous coal mine operators engaged in the production and sale of bituminous coal and other related associations and business entities, with its headquarters in Washington, District of Columbia, and its executive offices in Richlands, Virginia. The plaintiffs, Clint Eagle Mining Company, Inc., and Pigeon Branch Coal Co., Inc., are Virginia corporations engaged in the business of coal mining within Virginia and insured for workmen's compensation liability by the defendant, Old Republic Insurance Company. The plaintiff, Broyles and Dotson Coal Co., is a sole proprietorship domiciled in Virginia, engaging in the business of coal mining within Virginia and insured for workmen's compensation liability by the defendant, Old Republic Insurance Company. The plaintiff, AKP Coal Company, is a West Virginia Corporation authorized to do business in Kentucky, engaged in the business of coal mining within Kentucky and insured for workmen's compensation liability by the defendant, Old Republic Insurance Company. The plaintiff, Asher Coal Corporation, is a Kentucky corporation engaged in the business of coal mining within Kentucky and insured for workmen's compensation liability by both the defendants Old Republic Insurance Company and Bituminous Casualty Company. The remaining plaintiffs, Everidge and Nease Coal Co., Inc., Pine Coal Corporation and Clarence Maggard Coal Company, Incorporated, are Kentucky corporations engaged in the business of coal mining within Kentucky and insured for workmen's compensation liability by the defendant Old Republic Insurance Company.

The defendant, Old Republic Insurance Company, a Pennsylvania corporation, is en-

John W. Palmore, Nave, Williams & Palmore, Lexington, Ky., Kenneth P. Asbury, Wise, Va., Earl M. Cornett, Hindman, Ky., for plaintiffs.

E. Olen Culler, Press, Fenderson, Culler, Jones & Waechter, Richmond, Va., Frank Cummings, Washington, D. C., for defendants.

gaged in the business of insurance and is licensed to do business within Virginia and Kentucky. The defendant, Bituminous Casualty Corporation, an Illinois corporation, is engaged in the business of insurance and is licensed to do business within Virginia and Kentucky.

This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiffs are Virginia, Kentucky and West Virginia corporations or citizens, for diversity purposes, the defendants are Pennsylvania and Illinois corporations, and the amount in controversy exceeds ten thousand dollars. However, this court does not have jurisdiction on the basis of a federal question.

In order to have federal question jurisdiction, federal law must create the cause of action such that the federal question is an essential element of the plaintiff's complaint, or the construction and effect of a federal law must be in dispute. *City National Bank v. Edmisten*, 681 F.2d 942 at 945 (4th Cir. 1982). In the case at bar, while it is necessary to look to the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 901 *et seq.* and its subsequent amendments to understand the liabilities for black lung benefits placed on the plaintiffs by Congress, the effects of those statutes are not in dispute. The main question in this case is whether the defendants insured the plaintiffs for the increased liability imposed on them by the Black Lung Benefits Reform Act of 1977, Pub.L. 95–239, 92 Stat. 95, and its resolution revolves around the interpretation of an endorsement contained in the contracts between the plaintiffs and the defendants. Thus, this case involves a contract dispute between the parties, not a federal question, and jurisdiction of this court is based solely on diversity of citizenship, 28 U.S.C. § 1332.

The plaintiffs have moved for summary judgment and the defendants have moved for partial summary judgment, alleging that part of the claims are either moot or not ripe for judicial determination. The motions were argued orally before the court on March 19, 1982.

In order to understand the dispute involved in this case and to narrow the issues to be resolved, it is necessary for the court to discuss the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 901, *et seq.* (hereinafter 1969 Act) and its amendments.

Title IV of the 1969 Act was directed toward providing benefits to coal miners who were totally disabled due to pneumoconiosis which is commonly known as black lung disease. 30 U.S.C.A. § 901 (1971, Main Vol.) (amended 1972, 1978 and 1981). Under the 1969 Act, a miner or his surviving dependents could file a claim for benefits prior to December 31, 1972, and such a claim was to be paid by the Federal Government by the Secretary for the Department of Health, Education and Welfare and administered by the Social Security Administration, 30 U.S.C.A. §§ 921–923 (1971 Main Vol.) (amended 1972, 1978 and 1981). Claims filed on or before December 31, 1972 were called "Part B claims" and were to be paid from Federal revenues. 30 U.S.C.A. § 924(b). (1971, Main Vol.) (amended 1972 and 1978). Beginning January 1, 1973, all claims were to be filed pursuant to applicable state workmen's compensation law, and the responsibility for the payment of such benefits was to be borne by the last responsible coal operator-employer for whom the miner worked at least one year. 30 U.S.C.A. §§ 931–933 (1971, Main Vol.) (amended 1972, 1978, 1981). Claims filed after January 1, 1973, are called "Part C claims" regardless of when the injurious exposure occurred, and the administration of "Part C claims" was delegated to the Secretary of Labor. 30 U.S.C.A. § 931 (1971, Main Vol.) (amended 1972 and 1978). In the event a state workmen's compensation law did not provide adequate benefits, the Secretary of Labor was authorized to process and adjudicate claims and to assess liability against the appropriate coal mine operators pursuant to regulations adopted by the Department of Labor. No benefits were payable by an operator on account of death or total disability on account of pneumoconiosis, which did not arise, at least in part, out of employment in a mine when it was operated by such operator. 30 U.S.C.A. § 932(c)

(1971 Main Vol.) (amended 1972, 1978 and 1981).

The 1969 Act contained three basic presumptions which favored claimants in establishing disability as a result of pneumoconiosis. The presumptions in substance are as follows:

(1) If a miner who is suffering or has suffered from pneumoconiosis was employed for ten (10) years or more in one (1) or more coal mines, there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment;

(2) If a deceased miner was employed for ten (10) years or more in one or more coal mines and died from a respirable disease, there shall be a rebuttable presumption that his death was due to pneumoconiosis;

(3) If a miner suffered from a chronic dust disease of the lungs which is diagnosed as complicated pneumoconiosis, there is an irrebuttable presumption of total disability or death due to pneumoconiosis. 30 U.S.C. § 921(c) (1971 Main Vol.) (amended 1972, 1978 and 1981).

In 1972, Congress amended the 1969 Act by passage of the Black Lung Benefits Act of 1972, Pub.L. 92–303, 86 Stat. 150 (hereinafter 1972 Amendments). The 1972 Amendments extended the time to file a "Part B Claim" until June 30, 1973 for a miner and until December 31, 1973 for the survivors of deceased miners. 30 U.S.C. § 924 (1976) (amended 1978). Beginning January 1, 1974, the coal operators were to bear the liability for the payment of benefits resulting from claims filed after July 30, 1973, regardless of the date of injurious exposure. 30 U.S.C. §§ 931–933 (1976) (amended 1978 and 1981).

The 1972 Amendments redefined the term "total disability" to include the concept of "comparable employment" such that if the miner's pneumoconiosis "prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time" then the miner is totally disabled and entitled to benefits under the Act. 30 U.S.C. § 902(f) (1976) (amended 1978 and 1981). The 1972 Amendments also made further provisions for establishing pneumoconiosis by relevant evidence which demonstrated the existence of a totally disabling pulmonary respiratory impairment even though an x-ray examination was inconclusive. 30 U.S.C. § 921(c)(4) (1976) (amended 1978 and 1981).

In view of the 1972 Amendments, the Department of Labor developed regulations concerning the type and scope of liability insurance coal operators were required to purchase in order to satisfy the statutory requirements. 20 C.F.R. §§ 726.201–726.-213 (1981). An operator was also free to self-insure, and the regulations for self-insurers are found at 20 C.F.R. §§ 726.10–726.115 (1981).

If the coal operator chose to procure liability insurance rather than self-insure, regulation 20 C.F.R. § 726.203 (1981) required the following endorsement be attached and applicable to the standard workmen's compensation and employer's liability policy:

It is agreed that (1) With respect to operators in a State designated in item 3 of the declarations, the unqualified term 'workmen's compensation law' includes Part C of Title IV of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. section 931–936, and any laws amendatory thereto, or supplementary thereto, which may be or become effective while this policy is in force, and definition (a) of Insuring Agreement III is amended accordingly; (2) with respect to such insurance as is afforded by this endorsement, (a) the States, if any, named below, shall be deemed to be designated in item 3 of the declaration; (b) Insuring Agreement IV (2) is amended to read 'by disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the insured, to conditions causing the disease occurs during the policy period, or occurred prior to (effective date) and claim

based on such disease is first filed against the insured during the policy period.' 20 C.F.R. § 726.203 (1981).

As a result of this Department of Labor regulation, in the policy years beginning after July 1, 1973 and ending before March 1, 1978, the defendants and other insurers extended the standard workmen's compensation policy coverage to include certain federal black lung liabilities by the attachment of an endorsement, commonly referred to as the "1974 Endorsement." With only grammatical changes and the addition of the necessary effective date, July 1, 1973, the 1974 Endorsement is identical to 20 C.F.R. § 726.203 (1981).

Almost immediately after the 1972 Amendments were passed, Congress began to receive complaints from individuals whose claims had been denied. As a result of those complaints, Congress began to hold hearings in 1974 and each succeeding year until the Black Lung Benefits Reform Act of 1977, Pub.L. 95–239, 92 Stat. 95 (hereinafter 1977 Act) was passed on March 1, 1978. See J. Strader and P. Sheehe, Federal Black Lung: Ten Years of Legislation and Litigation, 16 Forum 525 (Winter 1981). The 1977 Act created a new presumption of liability for miners who had worked 25 years or more in the mines, 30 U.S.C. § 921(c)(5) (1978 Supp.) (amended 1981) and significantly eased the medical standards necessary to create a presumption of disability due to pneumoconiosis. 30 U.S.C. § 923(b) (1978 Supp.) (amended 1981).

More important to this litigation, however, the 1977 Act permitted any claimant who had pending claim or previously denied claims, to request a reconsideration of his claim in light of the more liberal 1977 medical standards. 30 U.S.C. § 945 (1978 Supp.). The review was either conducted by the Secretary of Health, Education and Welfare (now the Secretary of Health and Human Services) or by the Secretary of Labor. Id. Where a claimant elected to have his claim reviewed by the Secretary of Health, Education and Welfare, the Secretary was limited to evidence previously submitted in support of the pending or previously denied claim. Alternatively, when a claimant requested a review of the Secretary of Labor, the claimant was given an opportunity to submit additional medical or other evidence in support of the claim. Id.[1]

The parties to this action concur that the 1977 change affecting claimants with pending or previously denied claims created an enormous increase in liability for black lung benefits. The principal issue to be decided by this court is whether the 1974 Endorsement, added to the plaintiffs' standard workmen's compensation insurance policies by the defendants, provides coverage to the coal operators for the increased benefits arising out of the Black Lung Reform Act of 1977. As was admitted in oral argument, much of the plaintiffs' original claim became moot with the passage of the Black Lung Benefits Amendments of 1981, Pub.L. 97–119, 95 Stat. 1643 (hereinafter 1981 Amendments).

Under the 1981 Amendments, any Part B claim, a claim filed before July 1, 1973, that was denied by the Social Security Administration, and was allowed under the 1977 Act, would be paid for by the Black Lung Disability Trust Fund. 26 U.S.C.A. § 9501(d)(7) and 30 U.S.C.A. § 902(i). The Trust Fund would reimburse either the operator or the insurer for the amounts already paid for these B claims. 26 U.S.C.A. § 9501(d)(7). Only Part B claims which were not granted or denied by the Social Security Administration before March 1, 1978, would remain the operators' responsibility and according to the record, these plaintiffs do not have any such Part B claims. Therefore, as to these plaintiffs, the determination of the effect of the 1974

---

1. In the event of a request for review before the Secretary of Health, Education and Welfare, the date the claim was originally filed is considered the "date of filing of the claim." In the case of a review request before the Secretary for the Department of Labor, the date of the review request is considered the "date of filing of the claim." 30 U.S.C. § 945 (1978 Supp.).

Endorsement will not include the reconsideration of Part B claims.[2]

The Black Lung Disability Trust Fund would also reimburse the operators or the insurers for Part C claims

> in which (A) the claimant was notified by the Department of Labor of an administrative or informal denial more than 1 year prior to the date of enactment of the Black Lung Benefits Reform Act of 1977 and did not, within 1 year from the date of notification of such denial, request a hearing, present additional evidence or indicate an intention to present additional evidence, or (B) the claim was denied under the law in effect prior to the date of enactment of the Black Lung Benefits Reform Act of 1977 following a formal hearing or administrative or judicial review proceeding.

26 U.S.C.A. § 9501(d)(7) and 30 U.S.C.A. § 902(i)(2). Therefore, as to these plaintiffs, the determination of the effect of the 1974 Endorsement will not include any Part C claims which are included in the above quoted provision.[3]

The purpose of this litigation is to determine whether the plaintiffs or the defendants will bear the ultimate responsibility for those reconsideration C claims which are not covered by the 1981 Amendments. The defendants do not dispute liability for Part C claims in which the last exposure to coal dust arises after March 1, 1978, the effective date of the 1977 Act.

■ In a diversity case, such as this one, a federal court sitting in Virginia must apply the substantive law of Virginia, *Erie R. Co. v. Thompkin*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), which includes the forum's choice of law rules. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Virginia, the nature, validity and interpretation of a contract is governed by the law of the place where the contract was made. *Woodson v. Celina Mut. Ins. Co.*, 211 Va. 423, 426, 177 S.E.2d 610, 613 (1970).

■ On the basis of the pleadings, it appears that the state law applicable to each plaintiff is either Virginia or Kentucky law. The contracts of Clint Eagle Mining Company, Inc., Pigeon Branch Coal Co., Inc., and Broyles and Dotson Coal Co. would be interpreted under Virginia law because the contracts were presumably made in Virginia. The contracts of the remaining plaintiffs would be interpreted under Kentucky law because the contracts were presumably made in Kentucky.[4]

■ As a preliminary matter, there were some universal rules to be applied when interpreting an insurance contract, and Kentucky and Virginia are no exception. As with all contracts, where the language of the contract is clear and unambiguous, the intention of the parties must be derived from the language of the document itself. *Cheek v. Commonwealth Life Ins. Co.*, 277 Ky. 677, 685, 126 S.W.2d 1084, 1089 (1939); *Carter v. Carter*, 202 Va. 892, 896, 121 S.E.2d 482, 485 (1961). In determining whether an ambiguity exists, "it is a well established 'general principle' of insurance law that in construing a contract of insurance the test is not what the insurer intended the policy to mean, but what a reasonable person in the position of the named insured would have understood it to mean." *United States Fidelity and Guaranty Co. v. Drinkard*, 258 F.Supp. 380, 381 (W.D.Va.), *supplementing* 254 F.Supp. 867 (W.D.Va. 1966). *See also Cheek*, 277 Ky. at 686, 126 S.W.2d at 1089. Finally, any ambiguity in the policy is strictly construed against the insurance company and where there is room for different interpretations, the interpreta-

---

**2.** The court notes, however, that the analysis of the coverage extended by the 1974 Endorsement would be the same no matter whether the claim is a reconsideration Part B claim (claim filed before July 1, 1973) or a reconsideration Part C claim (claim filed on or after July 1, 1973).

**3.** *See* fn. 2.

**4.** While there are no affidavits in the record showing where the contracts were entered into, both plaintiffs' counsel and defendants' counsel argued that Virginia and Kentucky law would be controlling.

tion that is most favorable to the insured will be adopted. *Cheek,* 277 Ky. at 686, 126 S.W.2d at 1089; *Ayres v. Harleysville Mut. Casualty Co.,* 172 Va. 383, 389–90, 2 S.E.2d 303, 305–06 (1939).

With respect to those black lung benefit payments which remain the plaintiffs' responsibilities, and which are affected by the 1977 Act, the plaintiffs argue that the language of the 1974 Endorsement clearly anticipates subsequent changes in the law, and therefore provides insurance coverage to coal operators for black lung benefits regardless of subsequent Congressional action. The plaintiffs' position may be summarized as follows:

The retroactive aspects of the 1977 Act were the result of laws which were "amendatory" or "supplementary" to the Federal Coal Mine Health and Safety Act of 1969, and the 1977 Act became effective while the insurance policies were "in force." Therefore, the insurance coverage added to the standard workmen's compensation policy by the 1974 Endorsement covers the retroactive liability. The plaintiff also argues that any standard workmen's compensation policy which contained the 1974 Endorsement provided complete workmen's compensation coverage against all liabilities imposed by the 1969 Act, as amended.

The defendants argue that while the retroactive aspects of the 1977 Act were indeed laws "amendatory" and "supplementary" to the 1969 Act, the 1977 Act did not become effective while the policies were "in force." The defendants also deny that they "stepped into the shoes" of the coal operators for all liabilities imposed by the 1969 Act.

In essence then, this litigation centers around the meaning of the words "in force" in the context of the 1974 Endorsement. It is the plaintiffs' position that the term "in force" means that as long as a claim can be made against a particular policy, then such policy is still "in force." The defendants contend that the term "in force" is synonymous with the term "policy period."

Black's Law Dictionary defines "in force" as follows:

Power statically considered; that is at rest, or latent, but capable of being called into activity upon occasion for its exercise. Efficacy; legal validity. This is the meaning when we say that a statute or a contract is 'in force.'

*Black's Law Dictionary,* 774 (4th ed. rev. 1968).

Plaintiffs argue that since the 1974 Endorsement provides insurance protection to an insured not only for liabilities which occur and are claimed within a given policy period, but also extends coverage to an insured for claims which are first filed after a policy period but which occurred during such policy period, that the policy is still "in force" as long as claims may be made against it. By way of illustration, if a miner's last injurious exposure to coal dust was during the calendar year 1975 and an operator had purchased the Standard Workmen's Compensation with the 1974 Endorsement for that calendar year, coverage would be provided from such policy regardless of when the claim was filed, provided other laws or statutes of limitations do not bar the claim. Since the claim would be covered by the 1975 policy, regardless of whether it is made in 1975 or later, it is the plaintiffs' stance that the 1975 policy stays "in force" until the time when claims made against the policy are no longer valid.

The defendants strenuously contend that a policy is "in force" only during the policy period. The defendants cite several Kentucky and Virginia cases in support of their argument. In all three Kentucky cases, and one of the Virginia cases, however, the issue was whether the insured event took place during the policy period. In *Wilkinson v. Commonwealth Life Ins. Co.,* 176 Ky. 833, 197 S.W. 557 (1917), the question was whether the policy was effective on the date the policy was issued or on the date the insured received the policy. *Id.* at 838, 197 S.W. at 559. Since the second premium was not paid within one year and thirty days (the policy's grace period) of the issue date of the first policy, the court held that policy was no longer "in force." *Id.* at 840, 197 S.W. at 560.

In *Meridian Life Ins. Co. v. Milam*, 172 Ky. 75, 188 S.W. 879 (1916), the question was whether the insured died after one year from the date of the policy. Since the court concluded that the insured died after one year, but before any obligation to pay the next year's premium, the insured died while the policy was "in force" and during the policy period. *Id.* at 79, 188 S.W. at 880.

In *Cecil v. Kentucky Livestock Ins. Co.*, 165 Ky. 211, 176 S.W. 986 (1915), the question was whether the policy period began on the date the application for insurance was made or the date the insured received the contract. *Id.* at 212, 176 S.W. at 987. Since the court concluded that the parties agreed that the contract would not become effective until the insured received the contract, the insured event happened within the policy period and while the contract was "in force." Thus, the plaintiff was entitled to relief. *Id.*

Finally, in *Pilot Life Insurance Co. v. Karcher*, 217 Va. 497, 229 S.E.2d 884 (1976), the question was whether just the injury, or both the injury and the resulting disability must take place during the policy period for the insurer's liability to arise. *Id.* at 500, 229 S.E.2d at 887. The court concluded that both the injury and the disability must take place during the time period when the policy was "in force," and since the policy had lapsed prior to the disability, there was no liability. *Id.* at 501, 229 S.E.2d at 887.

Obviously, a contract of insurance is "in force" during the policy period. In the cases cited by the defendant, the courts were asked to determine when the policy period began, or whether the insured event took place during the policy period. These cases do not address the question of whether the contract of insurance is still "in force" when a claim may legitimately be made against it *after* the policy period. This question is also not addressed in *Weinstein v. Glens Falls Insurance Co.*, 202 Va. 722, 119 S.E.2d 497 (1961). There, the question was whether the insured building was a mercantile structure or a dwelling. *Id.* at 726, 119 S.E.2d at 500. The building was

destroyed during the policy period so there was no question that the policy was "in force." *Id.* at 725, 119 S.E.2d at 500.

However, *Aetna Casualty & Surety Co. v. Industrial Accident Commission*, 30 Cal.2d 388, 182 P.2d 159 (1947), did involve changes in workmen's compensation laws and the policies of insurance involved contained language similar to the 1974 Endorsement. The majority concluded that the California legislature did not intend to create any retroactive liability, nor was it necessary by implication to create any retroactive liability, and therefore the petitioners would not be liable for any retroactive benefits awarded by the Industrial Accident Commission. *Id.* 182 P.2d at 163. Justice Carter dissented on the belief that the legislators intended the new laws to be applied to accidents which occurred prior to the effective date of the Act. *Id.* 182 P.2d at 166 (Carter, J., dissenting).

In his dissent Justice Carter went on to explain that in any event, the insurance carriers were in no position to complain of the retroactive liability. *Id.* 182 P.2d at 174 (Carter, J., dissenting). The contract covered the California workmen's compensation laws and "*all laws amendatory thereof, or supplementary thereto* which may be or become effective while this *policy is in force.*" *Id.* (emphasis in original). Justice Carter stated that

such policies refer to amendments to the workmen's compensation law which become effective while the policies are in force. It may be that the term of such a policy (the term which the premium payment covered) would have expired before the amendment but the policy would still be in force in the sense that the obligation to pay compensation for any disability would continue to exist as long as it was related to an injury occurring during the term of the policy. It cannot be seriously doubted that liability under the policy continues after its specified term or premium period as to disabilities having their inception during the term.

*Id.*

In the case at bar, there is no doubt that Congress intended to create retroactive

528

liabilities for the coal operators. There is also no question that the liability under these policies continued after the policy period. The court is therefore in agreement with Justice Carter's definition of "in force" which comports with the definition from *Black's Law Dictionary*.

Accordingly, this court finds that the defendants are liable for any retroactive liability imposed upon the plaintiffs as a result of the Black Lung Benefits Reform Act of 1977.

Further, the court holds that the plaintiffs would prevail notwithstanding the court's definition of "in force." The plaintiffs have put forth a reasonable interpretation of the words "in force." While the defendants argue that "in force" means policy period, there is no clause in the contracts defining "in force." If the defendants intended that meaning, it should have been made clear to the plaintiffs by either using "policy period" where the words "in force" appear, or by defining "in force" somewhere in the contract. Since there is room for different interpretations of the words "in force," this term is ambiguous. Therefore, the court must adopt the interpretation most favorable to the insureds and find for the plaintiffs in this case. *Cheek v. Commonwealth Life Ins. Co.*, 277 Ky. 677, 126 S.W.2d 1084 (1939), *Ayres v. Harleysville Mut. Casualty Co.*, 172 Va. 383, 2 S.E.2d 303 (1939).

Since the court finds for the plaintiffs on the terms of the 1974 Endorsement, it does not reach the issue of whether the defendants "stand in the shoes" of the plaintiffs for any and all liabilities imposed by the 1969 Act, as amended.